**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : **CIVIL ACTION NO. 1:05-CV-2184** |
| *ex rel.* **TED D. KOSENSKE, M.D.,** | : |
| | : **(Judge Conner)** |
| **Plaintiff** | : |
| | : |
| **v.** | : |
| | : |
| **CARLISLE HMA, INC., and** | : |
| **HOSPITAL MANAGEMENT** | : |
| **ASSOCIATES, INC.,** | : |
| | : |
| **Defendants** | : |

**MEMORANDUM**

This is a *qui tam* action filed under the False Claims Act ("FCA"), 31 U.S.C.

§§ 3729-3733, by relator Ted. D. Kosenske ("Kosenske").  Kosenske alleges that

defendant Carlisle HMA, Inc. ("Carlisle HMA") and its parent company, defendant

Health Management Associates, Inc. ("HMA"), submitted false claims to Medicare

in violation of kickback and physician referral laws.  He predicates this case on FCA

*qui tam* provisions, 31 U.S.C. § 3730(b)-(d), which allow private individuals to bring

civil enforcement suits against those who have submitted false claims to the federal

government.  The FCA grants the government the right to intervene in *qui tam*

actions, 31 U.S.C. § 3730(b), but the government has declined to do so.  (See Doc. 5

at 1.)

On November 14, 2007, the court granted defendants summary judgment on

Kosenske's FCA claims.  (See Doc. 68.)  Kosenske thereafter appealed to the Third

Circuit Court of Appeals, which reversed the grant of summary judgment and

remanded the instant matter for further proceedings.  See Kosenske v. Carlisle

HMA, Inc., 554 F.3d 88 (3d Cir. 2009).  Presently before the court are the parties'

renewed cross-motions for summary judgment.  (Docs. 104, 107.)  For the reasons

that follow, both motions will be denied.

I.    **Statement of Facts** [1]

On December 31, 1992, Carlisle Hospital and Health Services[2] ("CHHS")

entered into an exclusive services agreement (the "1992 agreement") with Blue

Mountain Anesthesiology Associates, P.C. ("BMAA"), a newly-formed physicians

practice group.[3]  (See Doc. 68 at 2; Doc. 109 ¶ 6; Doc. 111 ¶ 6.)  The 1992 agreement

granted BMAA the exclusive right to provide around-the-clock anesthesiology and

pain management services at Carlisle Hospital.  (Doc. 109 ¶¶ 6-7; Doc. 111 ¶¶ 6-7.)  In

exchange, CHHS agreed to provide BMAA with the office space, supplies,

equipment, and personnel reasonably necessary to deliver its services.  (See Doc. 68

at 3.)

In 1998, CHHS opened a stand-alone pain management clinic at a newly

constructed outpatient treatment facility located approximately three miles from

the hospital.  (Doc. 44, Ex. D at 36; Doc. 53, Ex. 2 at 63; Doc. 76-2 at 9.)  BMAA

_____

[1] Given the applicable standard of review, the court will present the facts in
the light most favorable to the non-moving party with respect to each motion.  See
infra Part II.

[2] Carlisle Hospital and Health Services was the predecessor of Carlisle HMA
and former operator of Carlisle Hospital.  (See Doc. 68 at 2-3.)

[3] The parties are familiar with the circumstances of the present dispute and,
therefore, the court will set forth only those facts necessary for resolution of the
instant cross-motions for summary judgment.  For a more complete factual
recounting, see Dkt. No. 68 at 2-10.

immediately began to provide pain management services at this clinic, under terms substantially similar to those outlined in the 1992 agreement. (See Doc. 68 at 4 (citing record); Doc. 76-2 at 9.) Specifically, CHHS permitted BMAA to utilize the clinic space rent-free and offered equipment, support personnel, and supplies at no cost. (Doc. 47 ¶ 25; Doc. 49 ¶ 25; Doc. 68 at 6-7; Doc. 76-2 at 9.) In addition, BMAA and CHHS each submitted claims directly to Medicare and other third-party payors for their respective professional and facilities costs. (See Doc. 47 ¶ 29; Doc. 49 ¶ 29; Doc. 68 at 7; Doc. 76-2 at 9-10.) Although the parties continued to operate as if the 1992 agreement governed the relationship at the stand-alone facility, the agreement "did not, and obviously was not intended to, apply to services" at this new clinic. See Kosenske, 554 F.3d at 96.

In 2001, Carlisle HMA purchased the Carlisle Hospital and pain clinic from CHHS. (See Doc. 68 at 5-7 (citing record)). Carlisle HMA's parent company, HMA, thereafter installed new management to exercise administrative responsibility at the hospital. Among the officers hired after Carlisle HMA's purchase was Earl Fitzpatrick ("Fitzpatrick"), who became Carlisle Hospital's Medicare compliance officer. (See Doc. 45-5 at 10-11; Doc. 109, Ex. F ¶ 6.) Fitzpatrick, in turn, reported to Matthew Tormey ("Tormey"), HMA's national director of compliance and security, whose job was to provide oversight, training, and audit support to compliance officers at HMA's subsidiary hospitals. (See Doc. 106 ¶ 11; Doc. 109, Ex. F ¶¶ 2, 5; Doc. 114 ¶ 11.)

In early 2003, Fitzpatrick began a compliance investigation of the financial arrangement between the hospital and BMAA.  (See Doc. 45-5 at 30.)  His specific concern was that BMAA was paying no rent to the hospital and receiving physician support services at no cost.  (Id. at 34-35, 118.)  In addition, Fitzpatrick believed that the hospital was not receiving facility fees for a portion of BMAA's pain management services, and was therefore uncompensated for BMAA's use of the pain clinic.  (See Doc. 109 ¶¶ 30-31; Doc. 111 ¶¶ 30-31.)  Because BMAA physicians generated referrals for the hospital, Fitzpatrick worried that the above-described scenario ran afoul of anti-kickback regulations.  Fitzpatrick transmitted his concerns to Tormey via written memorandum on at least two occasions in the spring and summer of 2003.  (See Doc. 45-5 at 30-31, 37-40.)  The investigation remained pending in November 2003 when Fitzpatrick's employment with Carlisle Hospital was terminated.  (See id. at 10, 42-43; Doc. 109 ¶ 34; Doc. 109, Ex. F ¶ 9; Doc. 111 ¶ 34.)

Fitzpatrick was succeeded in his position as hospital compliance officer by Corey Rhoades ("Rhoades"), who also reported to Tormey.  (Doc. 106 ¶ 11; Doc. 109, Ex. G ¶ 4; Doc. 114 ¶ 11.)  Soon after his hiring, Rhoades was asked to review the hospital's financial relationship with BMAA.  (See Doc. 109, Ex. G ¶ 5.)  The parties agree that Rhoades' basic inquiry examined whether the hospital was recovering facility fees for BMAA's pain management services, (Doc. 109 ¶ 37; Doc. 111 ¶ 37), but sharply dispute whether Rhoades in fact confirmed that the hospital was billing

Medicare for such facility fees, (<u>compare</u> Doc. 109, Ex. F ¶ 10; Doc. 109, Ex. G ¶ 8,

<u>with</u> Doc. 45-12 at 167-69; Doc. 111 ¶ 38).

In January 2005, Rhoades prepared a corrective action plan for Tormey,

which identified the following concern:

> The hospital does not have a written agreement with the Anesthesiology
> group relating to their activities in the hospital's pain management
> center. . . . This is a complex issue that, if not resolved properly, could
> result in fundamental changes to the way the pain clinic is operated,
> including the potential discontinuation [of] pain clinic services.

(Doc. 106 ¶ 2; Doc. 114 ¶ 2.) Defendants contend that Tormey and Rhoades

subsequently concluded—albeit erroneously—that the 1992 agreement applied to

BMAA's service at the pain management clinic, thus obviating the necessity for a

new written agreement. (<u>See</u> Doc. 109 ¶ 42; Doc. 109, Ex. F ¶ 14; Doc. 109, Ex. G

¶ 7.) However, Kosenske highlights evidence in the record which contradicts

defendants' factual assertion: Tormey testified at his deposition that he had no

recollection of examining the agreement prior to 2005; he stated that he had not

analyzed the agreement to ensure its provisions were Medicare-compliant; and he

explained that he did not independently investigate the relationship between the

hospital and BMAA. (<u>See</u> Doc. 45-8 at 32-33, 68, 144.) Furthermore, although

Rhoades has submitted an affidavit indicating that he determined "in good faith,

that [the 1992 agreement] covered BMAA's services at the outpatient surgery

center," (Doc. 109, Ex. G ¶ 7), he expressed a somewhat conflicting sentiment in the

fall of 2005, when he told incoming compliance officer William Ziesmer ("Ziesmer")

that the hospital was not being reimbursed appropriately for pain management work, (see Doc. 45-12 at 168-72).[4]

Rhoades departed the hospital in September 2005 and was replaced by Ziesmer as hospital compliance officer. (See Doc. 45-12 at 10; Doc. 109, Ex. F ¶ 11; Doc. 109, Ex. G ¶ 2.) Soon after he was hired, Ziesmer conducted his own investigation into the hospital's receipt of facility fees for services rendered at BMAA's pain management clinic. (Doc. 109, Ex. F ¶ 12.) Ziesmer thereafter determined that the hospital was receiving sufficient reimbursement fees for the technical component of the services provided. (Doc. 109 ¶ 40; Doc. 111 ¶ 40.) In fact, Ziesmer testified that he "was not able to discover any patients we had not billed for. The staff, and the clinic, and Dr. Alster [BMAA president] all confirmed that we bill for every patient." (Doc. 109, Ex. 5 at 86.) No additional compliance audits were performed subsequent to Ziesmer's investigation and prior to commencement of the instant suit.

---

[4] Defendants also claim that Rhoades "concluded that rent was not required and that the terms of the BMAA/Hospital arrangement were fair to the Hospital because these terms were consistent with the usual and customary practices in the industry." (Doc. 109 ¶ 44.) Support for this assertion is found in a July 2009 affidavit sworn out by Rhoades for purposes of this litigation. However, in September 2005, Rhoades told Ziesmer that "he felt like the hospital was not appropriately being paid for the work they were doing," and that "it was inappropriate for the hospital to be performing work where physicians are being paid for the work and not the hospital." (Doc. 45-12 at 169-70.) Around the time of his departure from the hospital, Rhoades explained that reimbursement of the hospital for pain management services was "an issue that he had been unable to resolve." (See id. at 168-69.) Clearly, this presents an issue of disputed fact.

The crux of this suit involves Carlisle HMA's alleged non-compliance with the Stark Act, 42 U.S.C. § 1395nn, and Anti-Kickback Act, 42 U.S.C. § 1320a-7b, when submitting its claims for facilities costs to Medicare. These statutes prohibit a health care provider from paying physicians any form of compensation to induce them to refer patients to the provider. They also restrict a physician's ability to own a financial stake in a health care entity to which the physician refers patients. If a health care entity submits a claim to Medicare which derives from a prohibited referral source, it becomes a false claim to which FCA liability may attach. See United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 243 (3d Cir. 2004) (reversing district court dismissal of action under FCA because allegations that defendant violated Stark and Anti-Kickback Acts were sufficient to state a claim).

In the instant matter, Kosenske alleges that BMAA physicians maintain a financial relationship with Carlisle HMA because Carlisle HMA provides them with office space, supplies, equipment, personnel, and other benefits without charge. (See Doc. 1.) Kosenske submits that these benefits constitute compensation given to induce referrals of patients from the pain management clinic to the hospital and thus runs afoul of the Stark and Anti-Kickback Acts. On October 26, 2005, Kosenske filed a complaint levying these allegations. The parties litigated the dispute through the Rule 56 posture, and on November 14, 2007, the court concluded that defendants were not in violation of the FCA and granted summary judgment in defendants' favor. (See Doc. 68.) Kosenske appealed the court's

ruling, and the Third Circuit Court of Appeals reversed the decision and remanded the matter for further proceedings.  See Kosenske, 554 F.3d at 98-99.

The parties have filed renewed cross-motions for summary judgment on the issue of defendants' compliance with the Stark Act and the Anti-Kickback Act.  (See Docs. 104, 107.)  If the court finds a violation of the Stark Act, Kosenske also seeks summary judgment on the issue of defendants' liability under the FCA.  These matters have been fully briefed, and the court heard oral argument on December 2, 2009.

## II.    <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

In the instant matter, the parties have filed cross-motions for summary judgment.  According to the Third Circuit:

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008) (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).  Each movant must show that no genuine issue of material fact exists; if both parties fail to carry their respective burdens, the court must deny the motions.  See Facenda v. N.F.L. Films, Inc., 542 F.3d 1007, 1023 (3d Cir. 2008).  When reviewing each motion, the court is bound to view the evidence in the light most favorable to the nonmovant.  FED. R. CIV. P. 56; United States v. Hall, 730 F. Supp. 646, 648 (M.D. Pa. 1980).

## III.  Discussion

Kosenske alleges that defendants submitted claims to Medicare in violation of the Stark Act, 42 U.S.C. § 1395nn, and the Anti-Kickback Act, 42 U.S.C. § 1320a-7b.  Both statutes prohibit a health care entity from submitting to Medicare claims that derive from referrals ordered by physicians who receive compensation from the entity.  See 42 U.S.C. §§ 1395nn(a); 1320a-7b(b).  If the entity has paid compensation to a physician, the entity may submit claims connected to referrals made by the physician only if one of several exceptions to each statute applies.  See generally id. § 1395nn(c)-(e) (listing statutory exceptions to the Stark Act); 42 C.F.R.

§ 411.357 (listing regulatory exceptions to the Stark Act, which provide guidance about application of exceptions listed in statute); 42 C.F.R. § 1001.952 (creating exceptions to Anti-Kickback Act).  None of the exceptions is applicable to the arrangement between Carlisle HMA and BMAA.  See Kosenske, 554 F.3d at 96; (Doc. 68 at 17-18).

A claim knowingly made in violation of either statute constitutes a "false claim" submitted to the federal government and is prohibited by the FCA.  Zimmer, 386 F.3d at 243.  Therefore, the court must first address whether defendants contravened either the Stark or Anti-Kickback Acts before considering whether the FCA was violated.  Both parties request summary judgment on the Stark Act claim; defendants also seek summary judgment on the claim arising under the Anti-Kickback Act.  The parties also dispute the scope of the Third Circuit mandate, and Kosenske contends that the appellate court's decision conclusively establishes that there was a financial relationship between BMAA physicians and Carlisle HMA, thus triggering potential Stark liability.  The court will first address the claims arising from the Stark Act before proceeding to those anchored in the Anti-Kickback Act.

### A.    Stark Act

Evaluation of this case under the Stark Act requires two inquiries.  The court must first determine whether a financial relationship exists between BMAA and defendants that triggers Stark Act prohibitions.  The existence of a financial relationship necessarily implicates the Stark Act, for the Third Circuit has ruled

10

that no exceptions to the Act are applicable under the present circumstances.  If the

Stark Act is triggered, the court must determine whether defendants knowingly

violated its provisions, thus offending the FCA.

### 1. <u>The Ruling of the Third Circuit and the Law of the Case</u>

The "[l]aw of the case . . . doctrine posits that when a court decides upon a

rule of law, that decision should continue to govern the same issues in subsequent

stages in the same case." <u>Feesers, Inc. v. Michael Foods, Inc.</u>, 591 F.3d 191, 207 (3d

Cir. 2010) (quoting <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983)).  The purpose of

the doctrine is to "maintain consistency and avoid reconsideration of matters once

decided during the course of a single continuing lawsuit." <u>Casey v. Planned

Parenthood of Se. Pa.</u>, 14 F.3d 848, 856 (3d Cir. 1994) (quoting CHARLES A. WRIGHT

ET AL., 18 FEDERAL RULES AND PRACTICE § 4478 (1981)).  The Third Circuit Court of

Appeals has characterized the mandate rule as the "most compelling" of the law of

the case rules.  <u>See id.</u>  Thus, "[a] longstanding and central principle of [the] judicial

system is that 'an inferior court has no power or authority to deviate from the

mandate issued by an appellate court.'" <u>CGB Occupational Therapy, Inc. v. RHA

Health Servs.</u>, 499 F.3d 184, 197 (3d Cir. 2007) (Roth, J., dissenting) (quoting <u>Briggs

v. Pa. R.R. Co.</u>, 334 U.S. 304, 306 (1948)); <u>see also</u> <u>Bankers Trust Co. v. Bethlehem

Steel Corp.</u>, 761 F.2d 943, 949 (3d Cir. 1985).

In the instant matter, the scope of the Third Circuit mandate remains a

matter of considerable disagreement.  Resolution of this dispute requires the court

to consider "both the letter and spirit of the mandate, taking into account the

appellate court's opinion and the circumstances it embraces." <u>Bankers Trust Co.</u>, 761 F.2d at 949. However, "district courts are free to 'consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision.'" <u>Eichorn v. AT&T Corp.</u>, 484 F.3d 644, 657 (3d Cir. 2007) (quoting <u>Bankers Trust Co.</u>, 761 F.2d at 949-50); <u>see also</u> <u>In re City of Phila. Litig.</u>, 158 F.3d 711, 718 (3d Cir. 1998) (same).

Kosenske argues that the court of appeals' decision conclusively establishes the existence of a financial relationship between BMAA's physicians and Carlisle HMA. (<u>See</u> Doc. 105 at 5-9.) Defendants counter that although the Third Circuit ruled that there was a financial relationship between BMAA as an entity and Carlisle HMA, its decision is silent with respect to the existence of such a relationship between the hospital and the individual BMAA physicians. (<u>See</u> Doc. 113 at 26-28.) The distinction is important, for the Stark Act prohibits a physician from referring patients to a health care entity with which the *physician* has a "financial relationship" for services covered by Medicare or other federal health care programs. <u>See</u> 42 U.S.C. § 1395nn(a)(1). According to defendants, the circuit court merely held that BMAA—and not the individual physicians—had a financial relationship with Carlisle HMA. Thus, in defendants' telling, the central prerequisite of Stark liability is not implicated.

At the outset of its opinion, the Third Circuit framed one of the questions presented by the appeal as follows:

> First, we must decide whether the exclusive service arrangement between Kosenske's former practice, Blue Mountain Anesthesia Associates, P.C. ("BMAA"), and defendants, in which BMAA provided pain management services at an outpatient HMA clinic, triggered the restrictions placed by the Stark and Anti-Kickback Acts on the submissions of claims for services rendered following 'referrals' by a physician having a 'financial relationship' with the service provider. We conclude that the Stark and Anti-Kickback Act were implicated.

Kosenske, 554 F.3d at 91. As a matter of law, the Stark Act is not implicated unless there is a financial relationship between individual physicians and a health care entity. See § 1395nn(a)(1). Therefore, the appellate court's pronouncement that the Stark Act is implicated disposes of defendants' threshold argument.[5] See Eichorn, 484 F.3d at 657 (explaining that issues implicitly resolved by appellate decision are encompassed by the mandate). Absent a financial relationship between individual physicians and Carlisle HMA, there can be no Stark liability, and the Stark Act cannot be implicated. The mandate thus compels the undersigned to resolve this question in Kosenske's favor.

The Stark Act prohibits a physician from referring patients to a health care entity with which the physician has a "financial relationship" for services covered by Medicare or other federal health care programs. See 42 U.S.C. § 1395nn(a)(1). According to the mandate issued by the Third Circuit Court of Appeals, the physicians employed by BMAA maintained such a relationship with Carlisle HMA.

---

[5] Defendants argue that the appellate court did not consider whether the individual physicians maintained a financial relationship with Carlisle HMA, but this is belied by the Kosenske court's language analyzing this very issue. See, e.g., Kosenske, 554 F.3d at 94-95 (explaining the manner in which a physician may establish a financial relationship with a health care entity).

The court will therefore proceed to analyze whether defendants submitted

Medicare claims *knowing* the arrangement with BMAA ran afoul of the Stark Act.

Answering this inquiry in the affirmative will implicate FCA liability.

### 2.    Scienter Requirement

The FCA makes it unlawful for any person to knowingly submit Medicare

reimbursement claims for direct health services provided in violation of the Stark

Act.  See 31 U.S.C. § 3729(a); Zimmer, 386 F.3d at 245; United States ex rel.

Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997).

The term "knowingly," in the context of the FCA, requires that an individual

(1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of

the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth

or falsity of the information." § 3729(b); see also Zimmer, 386 F.3d at 242.  It is

unnecessary to present proof of specific intent to defraud.  United States ex rel.

Hefner v. Hackensack Univ. Med. Ctr., 495 F.3d 103, 109 (3d Cir. 2007).  In addition,

negligent or innocent mistakes are not actionable under this section.  See Hindo v.

Univ. of Health Sciences, 65 F.3d 608, 613 (7th Cir. 1995), cert. denied, 516 U.S. 1114

(1996).

Kosenske has presented no evidence that employees of Carlisle HMA

possessed actual knowledge that they were submitting Stark-tainted

reimbursement claims.[6]  Kosenske argues, however, that defendants acted with

reckless disregard or deliberate indifference of the truth or falsity of the

reimbursement information when they made insufficient attempts to ensure

hospital compliance with Stark regulations.  Under the FCA, "reckless disregard

lies on a spectrum between gross negligence and intentional harm."  <u>Laymon v.</u>

<u>Bombardier Transp. (Holdings) USA, Inc.</u>, Civ. A. No. 05-169, 2009 WL 793627, at

*12 (W.D. Pa. Mar. 23, 2009); <u>see also</u> <u>United States v. Krizek</u>, 111 F.3d 934, 941-42

(D.C. Cir. 1997) (same), <u>cert. denied</u>, 534 U.S. 1067 (2001).  In other words, Kosenske

---

[6] Kosenske's counsel essentially conceded this point at oral argument during
the following exchange:

| | |
|---|---|
| THE COURT: | So you'd concede that there's no actual knowledge here? |
| MR. SIMPSON: | I mean, Earl Fitzpatrick's memos come pretty close, but I'm not going to say that they actually knew that they were in violation, and the reason is because they never engaged in the kind of analysis that would have allow[ed] them to come to a conclusion either way, . . . ." |

(Doc. 129 at 114-15.)

must show that defendants acted with aggravated gross negligence.[7]  See Krizek, 111 F.3d at 942.

The summary judgment record shows that defendants were cognizant of their compliance obligations, for Carlisle HMA instituted policies as early as 2001 intended to ensure adherence with the Stark Act.  (See Doc. 45-8 at 19-21.)  In 2003, Carlisle HMA compliance officers became aware that the hospital's arrangement with BMAA may run afoul of the compliance policy.  Fitzpatrick informed Tormey via two written memoranda that the hospital appeared to be providing BMAA free office space in exchange for patient referrals.  Although Fitzpatrick attempted to investigate the arrangement, his inquiry remained pending in November 2003 when his employ with the hospital was terminated.  Tormey himself did not participate substantively in Fitzpatrick's investigation, (see Doc. 45-8 at 70-71), and it is not altogether clear whether he or Fitzpatrick explored the existence or non-existence of a financial relationship, the applicability of any Stark Act exceptions, or whether the hospital had submitted claims based upon prohibited referrals.  Kosenske argues that only a grossly negligent compliance investigator would fail to pose each

---

[7] "Gross negligence is defined as the 'lack of slight diligence or care' or 'a conscious, voluntary act or omission in reckless disregard of a legal duty.'"  Laymon v. Bombardier Transp. (Holdings) USA, Inc., Civ. A. No. 05-169, 2009 WL 793627, at *12 n.16 (W.D. Pa. Mar. 23, 2009) (quoting BLACK'S LAW DICTIONARY (8th ed. 2004) (Online edition)).  The Pennsylvania Supreme Court has defined gross negligence as "a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference.  The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care."  Albright v. Abington Mem'l Hosp., 696 A.2d 1159, 1164 (Pa. 1997).

of these questions, especially after red flags were raised like Fitzpatrick's memoranda.

Fitzpatrick's successor, Rhoades, undertook a compliance audit of his own soon after Fitzpatrick's exit, but the outcome of Rhoades' investigation is a matter of factual dispute. See supra Part I. Ziesmer, who testified as Carlisle HMA's 30(b)(6) witness, stated that Rhoades was unable to determine whether the hospital was receiving reimbursement for the technical component of BMAA's pain management services. In fact, Ziesmer indicated that Rhoades "felt like the hospital was not appropriately being paid for the work they were doing." (Doc. 45-12 at 168-69-69.) According to Kosenske, this testimony indicates that compliance issues were unresolved until at least September 2005, when Ziesmer was hired.[8]

---

[8] Defendants contend that Tormey evaluated the arrangement with BMAA around this time and concluded that it did not run afoul of compliance obligations. However, Tormey's statements are fraught with internal tension. In his deposition testimony, he stated that he had not personally analyzed the 1992 agreement with BMAA to ensure it was Medicare-compliant, and explained that he did not personally investigate the relationship between the hospital and the pain management clinic prior to commencement of this litigation. (See Doc. 45-8 at 32-33, 68, 144.) Tormey's affidavit, which was sworn out subsequent to the Third Circuit's ruling in this matter, paints a somewhat different portrait. He states that he "concluded . . . that the arrangement with BMAA was proper and did not violate any laws," that he believed that the 1992 agreement "covered all pain management services provided by BMAA," and that he concluded "that the Hospital and BMAA did not need to execute a new agreement as there already was a contract covering the pain management work at the outpatient surgery center." (Doc. 109, Ex. F ¶¶ 13-14.) Although the court does not go so far as to characterize this affidavit as a "sham," it certainly varies from Tormey's deposition testimony. Furthermore, the court finds that Tormey's prior deposition is more reliable than his subsequent affidavit. See Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007) (stating that "prior depositions are more reliable than affidavits" at summary judgment).

Furthermore, Kosenske notes that Rhoades did not inquire into the existence of a financial relationship, did not ask whether the arrangement satisfied a statutory exception, and did not attempt to determine whether the hospital was submitting Stark-tained referrals—all questions which are crucial to determining whether there is Stark compliance.[9] Defendants disagree with this assertion and point to an affidavit Rhoades recently submitted wherein he avers that he "reviewed the written contract between the Hospital and BMAA [and] . . . . concluded, in good faith, that it covered BMAA's services at the outpatient surgery center."[10] (Doc. 109, Ex. G ¶ 7.) Furthermore, Rhoades states that he found the terms of the arrangement to be "consistent with the usual and customary practices in the industry." (Id. ¶ 8.) Tormey also claims, in his affidavit, that he agreed with Rhoades' findings and concluded that the hospital's arrangement did not run afoul

_____

[9] As Kosenske points out, Tormey's deposition reveals how little he understood about the nature and scope of Rhoades' investigation. (See Doc. 116 at 17-18 (citing Tormey deposition testimony)). He stated that he could not recall having any "input" into the investigation, knew almost nothing about the manner in which Rhoades reached his conclusions, and made no independent investigative efforts of his own. (See Doc. 45-8 at 95, 119, 144.)

[10] Defendants contend that Rhoades and Tormey analyzed the applicability of the personal services exception, but much of the summary judgment record is in conflict on this point. For example, Carlisle HMA's 30(b)(6) designee, Ziesmer, testified that he was "not aware of discussing Stark in relation to [the 1992 agreement] prior to knowledge of this lawsuit." (Doc. 45-12 at 116.) Tormey had no recollection of the 1992 agreement prior to commencement of this lawsuit. (Doc. 45-8 at 32-33, 68, 144.) Additionally, while Rhoades states in his affidavit that "the arrangement did not violate Stark or any other law," (Doc. 109, Ex. G ¶ 10), this is, at the very least, somewhat divergent from Rhoades' view in 2005 when he purportedly told Ziesmer that the hospital was not being paid for its work.

of any regulations.  (See Doc. 109, Ex. F ¶¶ 10, 13.)  Such disagreement between Rhoades/Tormey and defendants' corporate designee serves to underscore the extent of the factual dispute and the contested quality of defendants' compliance investigation.

After Ziesmer was hired in late 2005, he was asked to conduct an audit of the hospital's facility fees to ensure that the hospital was receiving fees for all pain management services.  (Doc. 109 ¶ 40; Doc. 111 ¶ 40.)  Ziesmer thereafter concluded that the hospital was receiving the appropriate payments.  (Doc. 109 ¶ 40; Doc. 111 ¶ 40.)  Kosenske argues, however, that Ziesmer's audit did nothing to ensure Stark compliance:  after all, Ziesmer testified that he never discussed the Stark Act's applicability to the BMAA arrangement prior to the instant litigation, and he had no knowledge whether any Stark exceptions were applicable.  (See Doc. 45-12 at 116.)  What is more, when questioned about the legality of the arrangement with BMAA, Ziesmer stated, "I have an opinion as to whether or not what we're doing with BMAA is appropriate.  I don't know exactly how that relates to Stark, to the exceptions."  (Id.)  According to Kosenske, this demonstrates that Ziesmer's audit was not an attempt to ensure Stark compliance and is therefore another example of the hospital's reckless disregard of its compliance duties.

The sum total of this conflicting evidence creates a question of fact with regard to defendants' knowing submission of Stark-tainted reimbursements.  When the evidence is evaluated in the light most favorable to Kosenske, there is an arguable question whether Carlisle HMA compliance officers made an attempt to

19

investigate issues pertinent to Stark adherence.  They certainly knew of the Stark

regulations, but Kosenske's evidence suggests a reckless disregard of the duty to

assure hospital conformity with the law.  See Laymon, 2009 WL 793627, at *12 n.16

(explaining that gross negligence is a "'lack of slight diligence or care' or 'a

conscious, voluntary act or omission in reckless disregard of a legal duty'" (quoting

BLACK'S LAW DICTIONARY (8th ed. 2004) (Online edition))).

The result is similar when the evidence is viewed in the light most favorable

to defendants.  The affidavits of Rhoades and Tormey suggest a careful compliance

investigation that determined the hospital was acting in accordance with the Stark

Act.  Moreover, Rhoades' testimony—which is in conflict with Ziesmer's deposition

testimony—indicates that he concluded the 1992 agreement governed the hospital-

BMAA relationship and that the terms of the arrangement were consistent with

industry standards.  Even if the conclusions of the hospital audits were legally

erroneous, there is sufficient evidence to indicate that they were undertaken in

good faith by competent officers.  At this juncture, the court cannot state whether

defendants acted with reckless disregard of the truth, and this is a dispute that

must await resolution by the trier of fact.

### B.    Anti-Kickback Act

The Anti-Kickback Act, 42 U.S.C. § 1320a-7b, criminalizes the knowing and

willful payment of remuneration to a physician for referrals of services covered by a

federal health care program.  See § 1320a-7b(b)(2)(A).  Claims submitted in violation

of the Act qualify as "false claims" under the FCA, even if no criminal prosecution

follows the alleged violation.  See United States ex rel. Showell v. Phila. AFL, CIO Hosp. Ass'n, No Civ. A. 98-1916, 2000 WL 424274, at *7 (E.D. Pa. Apr. 18, 2000); see also United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., 238 F. Supp. 2d 258, 263 (D.D.C. 2002); cf. McNutt ex rel. United States v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1260 (11th Cir. 2005) (upholding denial of motion to dismiss under the FCA because government alleged violation of Anti-Kickback Act, which was sufficient to state a claim under the FCA).  In order to make out a prima facie case that the Anti-Kickback Act has been violated, a relator such as Kosenske must show that defendants "(1) caused claims to be submitted to the Government, (2) remunerated physicians with a purpose to induce referrals, and (3) knew that its actions violated the [Anti-Kickback Act]."[11]  Pogue, 238 F. Supp. 2d at 160.

According to the Third Circuit, the Anti-Kickback Act is violated if one purpose of the payment tendered from hospital to physician is to induce future referrals, even if "the payments were also intended to compensate for professional services."  United States v. Greber, 760 F.2d 68, 72 (3d Cir. 1985), cert. denied, 474 U.S. 988; see also 66 Fed. Reg. 856, 918 (Jan. 4, 2001) ("If any *one* purpose of remuneration is to induce or reward referrals of Federal health care program

---

[11] The Anti-Kickback Act features several regulatory safe harbor exceptions that remove certain contractual arrangements from its reach.  In fact, the court previously granted defendants summary judgment on Kosenske's Anti-Kickback claims after it found that the Act's exception for personal service and management contracts was applicable.  (See Doc. 68 at 31-33.)  This decision was, of course, reversed by the Third Circuit Court of Appeals, and defendants no longer contend that any Anti-Kickback safe harbors apply.

business, the statute is violated."). However, the mere fact that a hospital provides a physician remuneration for his or her services, and that the physician refers patients to the hospital, does not, by itself, constitute a violation of the Anti-Kickback Act. See Feldstein v. Nash Cmty. Health Servs., Inc., 51 F. Supp. 2d 673, 681 (E.D.N.C. 1999). Rather, "[t]he statute is aimed at the inducement factor." Polk County v. Peters, 800 F. Supp. 1451, 1454 (E.D. Tex. 1992); United States v. Kats, 871 F.2d 105, 108 (9th Cir. 1989) (same).

The general view—albeit one on which the Third Circuit has not opined—is that proof that a defendant knowingly violated the Anti-Kickback Act requires satisfaction of a "heightened *mens rea* standard." See United States v. Jain, 93 F.3d 436, 441 (8th Cir. 1996), cert. denied, 520 U.S. 1273 (1997). Some courts have held that this heightened standard requires proof that the defendant acted with knowledge that his or her actions violated specific provisions of the Anti-Kickback Act, see Hanlester Network v. Shalala, 51 F.3d 1390, 1400 (9th Cir. 1995); other tribunals simply demand a showing that the offender knew his or her conduct generally was wrongful, but not that such conduct violated a specific legal duty spelled out in the statute, see Jain, 93 F.3d at 441. A defendant's good faith is a cognizable defense to claims pursued under the Anti-Kickback Act and FCA. See Pogue, 565 F. Supp. 2d at 167.

In the matter *sub judice*, defendants claim Kosenske has failed to show that Carlisle HMA compensated BMAA physicians with a purpose to induce referrals, or

that defendants knowingly violated the Anti-Kickback Act.[12]  As an initial matter, there is no question that defendants provided BMAA physicians with remuneration; according to the Third Circuit, "BMAA received numerous benefits as a result of its relationship with HMA, including the exclusive right to provide all anesthesia and pain management services, and the receipt of office space, medical equipment and personnel.  These benefits constitute remuneration in-kind from HMA to BMAA, . . . ."  <u>Kosenske</u>, 554 F.3d at 96.  Thus, the pertinent inquiry is whether this remuneration was meant to induce referrals.

In June 2003, Fitzpatrick reported to Tormey that there was a "high probability" that the hospital's arrangement with BMAA and its physicians violated Medicare anti-kickback regulations.  (Doc. 45-6.)  The basis for Fitzpatrick's concern was his supposition that the hospital was not receiving facility fees for all of the pain management services provided by BMAA.  (<u>See</u> Doc. 109 ¶ 31; Doc. 111 ¶ 31.)  Fitzpatrick provided Tormey with a memorandum which explains that the Office of Inspector General "has specifically been targeting relationships between hospitals and physicians in which physician practices are provided staffing, equipment, or rent free or at a discounted rate with the possibility of receiving or generating referrals for such services."  (Doc. 45-6.)

---

[12] Kosenske has not filed a cross-motion for summary judgment on the Anti-Kickback claim.  Thus, the court will evaluate the evidence in the light most favorable to him.  <u>See</u> <u>supra</u> Part II.

Hospital compliance officers eventually determined that the hospital was receiving facility fees for services rendered at the pain management clinic. When a direct health services provider bills for a facility fee under an arrangement with a physician practice group, this constitutes a referral for the facility fee. See 73 Fed. Reg. 48434, 48729 (Aug. 19, 2008). What is more, this is an understanding that was arguably shared by Tormey, for he has characterized the hospital's receipt of facility fees as its end of a *quid pro quo* arrangement with BMAA. Specifically, he testified that

> access to the Hospital's space, equipment and personnel were not given to BMAA for free. Instead, they were furnished by the Hospital to BMAA as part of the Hospital's pain management services provided to Hospital patients, for which the Hospital received reimbursement (through receipt of facility fees). . . . Consequently, I believed that further compensation, such as rent, was not required because the Hospital was receiving its end of the quid pro quo described above.

(Doc. 109, Ex. F ¶ 16.) In this fashion, Tormey seems to characterize the BMAA-hospital arrangement as one in which the hospital provides certain benefits—which the Third Circuit has characterized as remunerative—and the hospital is compensated via referrals.

Of course, defendants object to this characterization, contending that BMAA physicians' access to equipment, personnel, and supplies was unlimited, and that provision of additional office space was in no way predicated upon the increased generation of referrals. BMAA physicians and and hospital compliance officers, including Rhoades and Tormey, have submitted affidavits asserting that BMAA's relocation was not premised on increased referral volume, but was motivated by a

24

desire to improve patient care. (See Doc. 109, Exs. A ¶¶ 12, 14; B ¶¶ 10, 12; C ¶¶ 11-12; D ¶ 7; E ¶¶ 3, 6.) Even if this assertion is accurate, however, the Anti-Kickback Act is implicated if one purpose of the arrangement is to induce referrals. See Greber, 760 F.2d at 72. Kosenske has come forth with enough evidence to place the issue in genuine dispute, and its resolution is a matter for the trier of fact.

The final prima facie showing required by the Anti-Kickback Act is that of scienter. As explained above, the Act imposes a heightened *mens rea* standard. See Jain, 93 F.3d at 441. A violation of the Act under the FCA "must have been made 'knowingly,' which can be proven by actual knowledge, deliberate ignorance, or reckless disregard.'" Pogue, 565 F. Supp. 2d at 167 (quoting United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc. ("Pogue II"), 238 F. Supp. 2d 258, 266 (D.D.C. 2002)). Although this standard may ultimately be difficult for Kosenske to satisfy, he has come forth with sufficient evidence to proceed past summary judgment. There is no question that as early as 2001, employees of Carlisle HMA were aware of the hospital's Medicare compliance obligations. (See Doc. 45-8 at 19-21.) Two years later, Fitzpatrick delivered to Tormey his memorandum warning that there was a "high probability" that the hospital was not compliant with the Anti-Kickback Act. (Doc. 45-6.) The record arguably contains evidence suggesting that in spite of Fitzpatrick's memorandum, the hospital continued to compensate BMAA and its physicians in exchange for facility fees. What is more, this compensation arrangement persisted after four compliance officers scrutinized the hospital's relationship with BMAA. Each of these officers ostensibly knew and

understood the requirements of the Anti-Kickback Act, and was fully aware that compensation was not to be exchanged for referrals. At least one of these officers, Tormey, considered the technical component referrals to be the hospital's '*quo*' in exchange for '*quid*' in the form of space and supplies. (Doc. 109, Ex. F ¶ 16.) Granted, this is a characterization of the evidence in the light most favorable to Kosenske. If he is capable of proving each of these facts at trial, however, a jury could well find that defendants were at least deliberately ignorant or recklessly disregarded the fact that the hospital's arrangement with BMAA was intended to induce ever-greater numbers of physician referrals. Summary judgment is therefore not warranted and the matter shall proceed to trial on the merits.

## IV.    Conclusion

For the foregoing reasons, the court will deny both parties' motions for summary judgment. The summary judgment record contains numerous disputed issues of fact which do not permit judgment as a matter of law on either the Stark of Anti-Kickback claims. Resolution of these disputes is the province of the trier of fact, and this matter shall proceed to trial.

An appropriate order follows.


   S/ Christopher C. Conner   
CHRISTOPHER C. CONNER
United States District Judge


Dated:        March 31, 2010

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CIVIL ACTION NO. 1:05-CV-2184** |
| *ex rel.* **TED D. KOSENSKE, M.D.,** | : | |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CARLISLE HMA, INC., and** | : | |
| **HOSPITAL MANAGEMENT** | : | |
| **ASSOCIATES, INC.,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 31st day of March, 2010, upon consideration of the cross-motions (Doc. 104, 107) for summary judgment, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. Relator's motion (Doc. 104) for summary judgment is DENIED.

2. Defendants' motion (Doc. 107) for summary judgment is DENIED.

3. A revised pretrial and trial schedule shall issue by future order of court.

 

 

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge